IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 2:02-CV-1372-WKW |
| ASSET RECOVERY AND MANAGEMENT TRUST, S.A., *et al.*, | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is Plaintiff Securities and Exchange Commission's ("Commission" or "SEC") Motion for Summary Judgment (Doc. # 231) on the Commission's claims against Defendant Milton E. Vaughn ("Mr. Vaughn"). The motion is accompanied by evidence and a memorandum of law. (Doc. # 232.) Mr. Vaughn filed a two-paragraph, unsupported statement in response to the Commission's motion. (Doc. # 233.) After careful consideration of the arguments of counsel, the relevant law and the record as a whole, the court finds that the motion is due to be granted.

## I. JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations of each.

## II.  STANDARD OF REVIEW

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Under Rule 56, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).  The movant can meet this burden by presenting evidence showing that there is no genuine issue of material fact, or by showing that the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Celotex Corp.*, 477 U.S. at 322-23.

Once the moving party has met its burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A genuine factual dispute exists if "a reasonable jury could return a verdict for the non-moving party." *Damon v. Fleming Supermarkets, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (internal quotation marks and citation omitted).  After the nonmoving party has responded to the motion for summary

2

judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

### III.  FACTS[1]

### A.  Introduction

The SEC commenced this action based on allegations that, beginning in late 1999 and continuing at least into 2002, Mr. Vaughn and others participated in an Internet-based "Prime Bank" scheme through an entity called Asset Recovery and Management Trust, S.A., a/k/a Armtrust, S.A. ("ARM" or "Armtrust").[2]  "Prime Bank" schemes are "common fraud[s] in which the perpetrators solicit investments by telling prospective investors that the investors' money will be invested in high-yield bank-issued securities not available or even known to the general public."  *Sec. & Exch. Comm'n v. Lyttle*, 538 F.3d 601, 602 (7th Cir. 2008).

As described more fully below, the SEC has presented evidence that the ARM scheme defrauded numerous U.S. investors out of at least $1.2 million.  Primarily through its website, ARM offered two things: (1) "recovery services" in which ARM would attempt to recover lost or stolen funds for individual who had invested in other Prime Bank trading programs; and (2) investments in ARM's own supposed high-yield offshore trading programs.  In

---

[1]  These facts are undisputed.  Mr. Vaughn's opposition to the Commission's motion for summary judgment, which consists of a two-sentence denial of liability, included no materials rebutting the factual submissions by the SEC.  (Doc. # 233.)

[2]  ARM also was named as a defendant in this action.  By Order dated October 6, 2008, the court allowed the SEC's motion for default judgment against ARM (Doc. # 238) and entered judgment in favor of the SEC and against ARM (Doc. # 239).  Based on the SEC's subsequently-filed motion (Doc. # 241) and evidence garnered by the SEC in its additional investigation of the minimum loss to the investors whom Defendants defrauded, the court by separate Order has amended that judgment to reflect the additional losses and that liability among Defendants is joint and several.

particular, the SEC submits evidence that ARM targeted victims of a prior scam by now-deceased Defendant Frank Johnson ("Mr. Johnson") called the International Benevolent Fund Trust ("IBFT").

Through emails and its website, ARM told investors they could earn between eight and sixteen times their original investments in a matter of months.  ARM also guaranteed that the investors' principal was "fully secured" and never at risk.  However, ARM's trading programs never existed.  Investors were instructed to send funds to ARM's office in Costa Rica.  Once it received the funds, ARM provided investors with documents and correspondence claiming that it had invested the monies in the purported trading programs, along with periodic updates on how the programs supposedly were progressing.  When investors attempted to recoup their investments, however, ARM refused to provide the promised profits.

## B.  Mr. Johnson's Previous Prime Bank Scheme

On October 14, 1999, in an information, the United States Attorney for the Middle District of Alabama charged Mr. Johnson with engaging in the IBFT Prime Bank scheme and defrauding IBFT investors of approximately $625,000.  (Doc. # 114 (SEC's App. to Mot. Summ. J., Tab 14).)  As charged, Mr. Johnson managed IBFT, controlled the fund and maintained contact with IBFT investors.  (Doc. # 114 (Tab 14).)  When investors were not paid according to schedule, Mr. Johnson caused a phone message to be made accessible to IBFT investors in which Mr. Johnson falsely represented that he did not receive compensation, commissions or benefits from IBFT when, in fact, he used their money for his

own benefit and to purchase real property for his benefit.  (Doc. # 114 (Tab 14).)  Mr. Johnson pleaded guilty to the information which charged him with wire fraud, in violation of 18 U.S.C. § 1343.  (Doc. # 232 (Suppl. Ex. 1 to SEC's Mot. Summ. J.).)

### C.  Mr. Johnson's Introduction of ARM to His IBFT Victims

In November 1999 – one month after entering his plea agreement but still eight months before being incarcerated – Mr. Johnson informed IBFT investors by a signed letter that the IBFT trading program had earned profits, but that the profits had been illegally withheld by certain individuals and/or companies that administered IBFT's trading.  (Doc. # 114 (James E. Smith Dep. at 26-31, Tab 9); Doc. # 114 (Johnson letter to IBFT investors, Tab 17); Doc. # 232 (Suppl. Ex. 2).)  To solve this problem, Mr. Johnson stated that he had contracted with ARM – "a renowned international organization" – to recover these supposed profits.  (Doc. # 114 (Tab. 17).)  Mr. Johnson represented that IBFT had "carefully studied and considered every aspect of [ARM's] services and elected to retain [ARM] to represent IBFT."  (Doc. # 114 (Tab. 17).)  Mr. Johnson directed IBFT investors to ARM's website stating that they would be receiving an informational package from ARM shortly.  In addition, at least one investor received a letter purporting to be from Mr. Johnson advising the investor that his IBFT profits could be reinvested in ARM's trading programs.  Mr. Johnson also referred investors to ARM's website through a voice recorded messaging service that he periodically used to update IBFT investors regarding their investments.  (Doc. # 114 (Smith Dep. at 60-62, Tab 9); Doc. # 114 (Timothy McKenzie Dep. at 11-12, Tab 8).)  In addition, investors received correspondence from ARM – specifically addressed to

"Clients of I.B.F.T." – which referenced the fact that ARM had entered into an agreement with IBFT and "Reverend Johnson" to recover funds owed to IBFT investors.  (Doc. # 114 (Tab 13A); Doc. #  232 (Suppl. Ex. 3).)

After Mr. Johnson referred his IBFT victims to ARM, ARM's operations continued and additional investors were contacted.   On December 23, 1999, Mr. Vaughn and codefendant Carlos Fernandez Alfaro ("Mr. Alfaro") registered ARM as a Costa Rican corporation.  (Doc. #  114 (Tab 18).)  ARM also began sending letters to IBFT investors stating that it had been retained to recover IBFT's profits.  (Doc. #  114 (Tabs 13A & 17; Doc. # 232 (Suppl. Ex. 2).)  At the same time, ARM offered IBFT investors the opportunity to join ARM's own high-yield, offshore trading programs, which were similar to IBFT's supposed programs.  (Doc. # 114 (Tab 13A).)  ARM, however, claimed its programs were safe because investors' funds remained in ARM's account during the trading period and could be withdrawn by investors at any time.  (Doc. # 114 (Tab 12B).)  According to ARM, this factor eliminated the risk of middlemen absconding with investor funds, which ARM claimed was what had happened to the IBFT funds.  (Doc. # 114 (Tab 13A).)

D.  ARM's Trading Programs

Between November 1999 and July 2000, ARM enticed investors to join its purported trading programs.  (Doc. #  114 (Tab 11A, Tab 12A, Tab 13B).)  ARM's programs, which were described in documents provided to investors and on ARM's website, allegedly involved trading debt instruments known as "bank debentures" and "standby letters of credit" through "world trading banks."  (Doc. #  114 (Tab 11A, B, C; Tab 12B, C, D; Tab 13B, C,

D, E).)  ARM's website stated that these instruments were traded in forty-week cycles, conformed to the practices set forth by the "International Chamber of Commerce," and were fully secured by a bank endorsed guarantee.  (Doc. # 114 (Tab 12B).)  ARM's website further stated that these programs were not generally known and were typically available only to select investors with millions of dollars. (Doc. # 114 (Tab 12B).)  ARM stated, however, that by pooling funds together, investors could participate in its programs for as little as $100 per person.  (Doc. #  114 (Tab 12B).)

ARM offered investors the opportunity to participate in various trading programs. None of ARM's offerings was ever registered with the Commission.  To participate in the trading programs, investors entered into "joint venture contracts" with ARM.  (Doc. #  114 (Tab 11A, Tab 12A, Tab 13C).)  Under the contracts, ARM claimed it would pool investor funds and trade them through world banks, with expected returns of between eight and fifteen times the principal invested in three to ten months.  (Doc. #  114 (Tab 11A, Tab 12A, Tab 13C).)  ARM assured investors that their principal was secure and could be withdrawn at any time and encouraged investors to solicit others to join ARM's trading programs.  (Doc. # 114 (Tab 11B, Tab 12A, Tab 13C, D).)

From the outset, through its recorded updates and in emails, ARM informed investors that its trading programs were producing the expected profits.  (Doc. # 114, Tommy Buckley Dep. at 39 (Tab 2); Linda Crowe Dep. at 20-22 (Tab 3); Marlene Hall Dep. at 38-42 (Tab 4).) As the joint venture contracts supposedly matured, ARM offered investors the opportunity to roll the funds into new programs or withdraw their principal and profits.  When some investors

requested their funds, however, ARM either failed to pay out the purported profits or provided investors with a nominal "partial payout."  (Doc. #  114 (Tab 2 at 40-44); Doc. # 114 (Tab 4 at 42-46).)   In other instances, ARM provided several varying and false explanations for delaying payments.  For example, in May 2001, ARM claimed that a hurricane hit an island where the payments were administered, disrupting trading and delaying payments. (Doc. # 114 at 40 (Tab 2).)   In September 2001, ARM claimed that the heightened scrutiny of money transfers in the aftermath of September 11th prevented it from making payments. (Doc. # 114 (Tab 11E).) Beginning in June 2001, ARM advised investors that the SEC's investigation was hindering the distribution of profits and stated that anyone who assisted the investigation would lose both his principal investment and profits. (Doc. # 114 (Tab 11D; Tab 12I, J).)  The SEC's investigation uncovered only one investor who received any profits from ARM's programs. (Doc. #  114 (Tab 2 at 40-41; Tab 3 at 17-18; Tab 4 at 45-46; Tab 9 at 46-58).)  The investor who saw a return of funds did so only after repeated entreaties and threats to ARM.  (Doc. # 114 (Tab 9 at 48-58).)

E.  The Flow of Investors' Funds

ARM raised at least $1.2 million through its scam.  (Doc. # 242 (Keith Prive Decl. ¶¶ 4-5).) The SEC's investigation revealed records of correspondent accounts held by Costa Rican banks at U.S. banks; those records showed that there were four Costa Rican banks into

which investor funds were deposited.  (Doc. #114 (Tabs 20-24).)  No data was presented from the Costa Rican banks themselves.[3]

ARM directed its investors to send their cashier's checks directly to Costa Rica.  (Doc. # 114 (Tab 2 at 22; Tab 3 at 9-10; Tab 4 at 9).)  From there, ARM deposited more than $900,000 of investor funds into The Reserve Fund, a New York-based investment company. (Doc. # 242 (Prive Decl.).)  Mr. Vaughn and Mr. Alfaro had signature authority over ARM's account at The Reserve Fund.  (Doc. # 114 (Tab 20).)  Mr. Vaughn drew on those funds to pay certain of ARM's expenses; however, the vast majority of the funds were sent back offshore.  (Doc. # 232 (Suppl. Ex. 5 at 113-115, 118-21).)  The records from The Reserve Fund include hundreds of checks and money orders from investors that were made payable to ARM, including some that flowed through Bantec Internacional, S.A., one of ARM's Costa Rican banks.  (Doc. # 242 (Prive Decl. ¶ 6).)  ARM also deposited about $20,000 directly into an account held in the name of AAA Management Services, Inc., a company Mr. Vaughn controlled.  (Doc. #  114 (Tabs 20 & 22).)

F.   The Roles of Mr. Johnson and Mr. Vaughn in the ARM Fraud

The Commission asserts that ARM was designed to make it difficult to trace the company's operations to particular individuals.  ARM communicated with investors only in impersonal ways: by messages on its website, through email, in fax transmissions, and through call-in access to prerecorded voice mail messages.   As the investor depositions and

---

[3] The SEC indicated that it was unable to get documentation from the Costa Rican banks directly.  Although Letters Rogatory were sent from the United States to Costa Rica seeking this information, there was no response.  (Doc. # 242 (Prive Decl. ¶ 4).)

documentation show, ARM's correspondence typically was signed simply "Armtrust" or "J.W. Williamson."  (Doc. # 114 *passim*.)  Records from Interland, Inc., the firm that hosted ARM's website, show that ARM paid for the service through a credit card issued by Bantec Internacional, S.A., a Costa Rican bank at which ARM had an account. (Doc. # 114 (Tab 16).) The name on the credit card was "R.W. Williamson." (Doc. # 114 (Tab 16).)  Like the "J.W. Williamson" whose name appears on some of the ARM correspondence, there is no evidence that any such person exists.  ARM's designated representative at Bantec was Carlos Fernandez, which is a shortened version of Mr. Alfaro's full name.  ARM investors have never been able to speak directly with any ARM personnel.  (Doc. # 114 *passim*.)  In short, the evidence shows that the individuals behind ARM went to great lengths to hide their identities.  Notwithstanding those efforts, evidence ties Mr. Johnson and Mr. Vaughn to the fraud perpetrated by and through ARM.

### 1.  Frank R. Johnson

Shortly after pleading guilty to wire fraud in connection with the IBFT fraud, Mr. Johnson directed – by letter and voice mail recordings – IBFT investors to ARM's website, claiming that he had retained ARM to recover IBFT's funds.  Mr. Johnson encouraged investors to support ARM and vouched for ARM's integrity. (Doc. # 114 (Tab 9 at 26-31); (Tab 17); Doc. # 232 (Suppl. Ex. 2).)  In addition, on May 27, 2001, Mr. Johnson was appointed to ARM's board of directors and named its treasurer. (Doc. # 232 (Suppl. Ex. 4).)

Additional evidence from January 2002 links Mr. Johnson to ARM and its operations. On January 11, 2002, and January 12, 2002, in an email updating its investors, ARM

indicated that it had discovered another money-making opportunity that would help investors meet their immediate financial needs.  (Doc. #  114 (Tab 19).)  This opportunity was the chance to invest in a multi-level network marketing program operated by The Legacy Foundation International ("Legacy").  Legacy sought members to join its program, which provided online educational materials.  New Legacy members would solicit others to join Legacy and receive commissions for each recruit, each recruit's recruit, and so on.  In its January 11 and 12 emails, ARM told its investors that most of its management had joined Legacy, and offered to enroll interested ARM investors in Legacy's program.  (Doc. # 114 (Tab 19).)  Because of the structure of Legacy's payment scheme, those ARM investors who signed up for Legacy's program would generate commissions for ARM or for the individual behind ARM, on whose behalf the solicitation was being done.  (Doc. # 114 (Tab 19).)

Mr. Johnson was one of the individuals responsible for ARM's January 11 and 12 emails.  One of the individuals whom ARM contacted with its solicitation about Legacy was Michael Pope ("Mr. Pope").  (Doc. # 114 (Tab 19).)  Mr. Pope was an IBTF investor who lost money in IBTF and then was referred to ARM by Mr. Johnson.  (Doc. # 114 (Tab 19).)  Mr. Pope informed ARM that he wished to participate in the Legacy program.  (Doc. # 114 (Tab 19).)  After he enrolled, and was assigned the report number 103409, emails generated by Legacy identified Mr. Johnson as the person responsible for enrolling Mr. Pope and benefitting from his participation.  (Doc. # 114 (Jan. 14, 2002 email, Tab 19); Edward Hilovsky Dep. at 9-25 (Tab 5); Bruce Lauzon Dep. at 4-10 (Tab 7).)

## 2. *Milton E. Vaughn*

Mr. Vaughn was a cofounder of ARM and its president.  (Doc. # 114 (Tab 18).)  Mr. Vaughn was a signatory on one of ARM's accounts at The Reserve Fund and made payments from that account for ARM's telephone and fax services.  (Doc. # 114 (Tabs 15 & 20).)  ARM also deposited about $20,000 directly into an account of an entity Mr. Vaughn controlled.  (Doc. # 114 (Tab 22).)

Mr. Vaughn asked Mr. Alfaro to register ARM as a corporation in Costa Rica.  (Doc. # 114 (Tab 22 at 34-35).)  Mr. Vaughn also requested that ARM be able to receive mail at Mr. Alfaro's offices in Costa Rica.  (Doc. # 232 (Suppl. Ex. 5 at 35-36).)  Mail addressed to ARM and related entities went to Mr. Vaughn or individuals associated with Mr. Vaughn.  (Doc. # 232 (Suppl. Ex. 5 at 63-67).)  Mr. Alfaro, from his dealings with and observations of ARM, identified Mr. Vaughn as the "boss" of that entity.  (Doc. # 232 (Suppl. Ex. 5 at 69-70, 188-90).)

Acting at Mr. Vaughn's direction, Mr. Alfaro opened up bank accounts for ARM in Costa Rica.  (Doc. # 232 (Suppl. Ex. 5 at 91-105).)  And, at Mr. Vaughn's direction or at the direction of those who were directed by Mr. Vaughn, Mr. Alfaro used those accounts to pay ARM's expenses and to send wire transfers of investor monies.  Some of these wire transfers were to financial institutions in Latvia.  (Doc. # 232 (Suppl. Ex. 5 at 125-33).)  The money used to pay ARM expenses and transferred internationally was money from investors.  (Doc. # 232 (Suppl. Ex. 5 at 152-55).)

## IV. DISCUSSION

### A. Defendant Vaughn Committed Securities Fraud

#### 1. The Applicable Securities Law

Section 17(a) of the Securities Act prohibits the following misconduct in the offer or sale of securities: (1) devices, schemes or artifices to defraud; (2) obtaining money or property by means of materially false or misleading statements; and (3) transactions, practices or courses of business that operate as a fraud or deceit. 15 U.S.C. §77q(a). Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit similar misconduct in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

A misstatement or omitted fact is material if there is a substantial likelihood that a reasonable investor would attach importance to the fact misrepresented or omitted in determining his or her course of action. *Basic, Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988)*; Sec. & Exch. Comm'n v. Carriba Air, Inc.,* 681 F.2d 1318, 1323-24 (11th Cir. 1982). Unlike a private plaintiff, however, the Commission need not prove that investors actually relied upon the misrepresentations. *Sec. & Exch. Comm'n v. Rana Research, Inc*., 8 F.3d 1358, 1364 (9th Cir. 1993); *Sec. & Exch. Comm'n  v. Infinity Group Co.,* 993 F. Supp. 324, 327 (E.D. Pa. 1998)*, aff'd*, 212 F.3d 180 (3d Cir. 2000). Even were the SEC held to the higher standard, the evidence in this case establishes that investors relied on the misrepresentations of Defendants, including Mr. Vaughn.

Violations of Section 17(a)(1), Section 10(b) and Rule 10b-5 require a showing of *scienter*. *Aaron v. Sec. & Exch. Comm'n,* 446 U.S. 680, 686 & n.5, 697 (1980); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976); *Ross v. Bank South, N.A.*, 885 F.2d 723, 728 (11th Cir. 1989). Recklessness satisfies the *scienter* requirement. *Sec. & Exch. Comm'n v. Southwest Coal & Energy Co.*, 624 F.2d 1312, 1320 (5th Cir. 1980).[4] "Reckless conduct" is "defined as a highly unreasonable omission, involving not merely simple, or even unexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 1321 n.17.

As set forth below, Mr. Vaughn committed securities fraud for purposes of Section 17(a)(i), Section 10(b) and Rule 10b-5. The evidence establishes that his conduct was intentional. ARM was a sham. Mr. Vaughn, one of ARM's principal actors, acted intentionally to carry out ARM's solicitations of investors, and the management of ARM, with that direct knowledge. His actions also satisfy the "reckless" standard; any reasonable person in his position – as a principal of ARM – who made even the most cursory review of ARM's business activities would discern that those activities were not legitimate and that they were designed to defraud those who were targeted as investors.

---

[4] In *Bonner v. City of Prichard*, the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981. *See* 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

### 2. Mr. Vaughn, via ARM, Made Material Misrepresentations to Investors

Mr. Vaughn, directly and indirectly, made false and misleading statements to the investors about the existence of the purported trading program, the expected profits, and the guarantees for the investment. ARM's purported trading program – trading in obscure bank instruments by unidentified persons in undisclosed locations, generating extraordinary returns – is a typical "prime bank" scheme. *See, e.g., Lyttle*, 538 F.3d at 602-03 (discussing "prime bank" schemes). The misrepresentations were material because a reasonable investor would want to know that the investments in question did not exist and that the risk of loss was very high. *See Sec. & Exch. Comm'n,* No. 95cv3099, 1997 WL 767570, at *3 (S.D.N.Y. Dec. 10, 1997) (fictitious "prime bank guarantees"); *Sec. & Exch. Comm'n*, No. 94cv5737, 1995 WL 562180, at *3 (S.D.N.Y. Sept. 20, 1995) (fictitious "prime bank notes"). As the Seventh Circuit has explained,

> An elementary form of such misrepresentation is misrepresenting an interest as a security when it is nothing of the kind. Konex told Lauer that the $ 10 million (later $ 14 million) that he was investing with Konex would be used along with investments by other investors to purchase Prime Bank Instruments. The effect was to represent Lauer's interest as being an investment contract. It was nothing of the kind. It was the perilous deposit of money with a fraud.

*Sec. Exch. Comm'n v. Lauer*, 52 F.3d 667, 670-71 (7th Cir. 1995).

### 3. The Misrepresentations Were in connection with the Purchase or Sale of Security

For two reasons, the court finds that the misrepresentations by Mr. Vaughn were made in connection with the purchase or sale of a security. First, investments in the trading program were "investment contracts" and were "securities." Section 2(a)(1) of the Securities Act and Section 3(a)(l0) of the Exchange Act both define "security" to include "investment

15

contract."   15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10).   An "investment contract" requires: "(1) the investment of money (2) in a common enterprise (3) with an expectation of profits to be derived solely from the efforts of the promoter or a third party."   *Sec. Exch. Comm'n v. SG Ltd.,* 265 F.3d 42, 46 (1st Cir. 2001).

Here, all three prongs are satisfied.   First, the investors parted with their money in "anticipation of investment gains."   *Id.* at 49.   Second, there was a common enterprise because the investors' funds were to be pooled "in such a manner that all share in the profits and risks of the enterprise."   *Id.* at 50.   Third, the expectation of profits rested solely on the efforts of others (those responsible for the operations of ARM).   *Id.* at 53.

Courts readily have concluded that investments in similar trading programs constituted investment contracts and thus securities.   *See Sec. Exch. Comm'n v. Deyon,* 977 F. Supp. 510, 516-17 (D. Me. 1997) (joint venture to trade in prime bank debentures was "investment contract" because investor funds were pooled and fortunes of investors and promoters were linked), *aff'd.,* 201 F.3d 428 (1st Cir. 1998) (unpublished); *Sec. Exch. Comm'n v. Pinckney*, 923 F. Supp 76, 82  (E.D.N.C. 1996) (investment program involving letter of intent from "top five U.S. bank" was "investment contract" because promoters' and investors' profits were linked).

For this purpose, it does not matter that ARM's trading program did not actually exist. As the Eleventh Circuit has observed, "[T]he fact that an investment company's operations are a sham . . . does not mean that the investment company can avoid" the federal securities laws.   *Sec. Exch. Comm'n v. Unique Fin. Concepts, Inc*., 196 F.3d 1195, 1200 (11th Cir.

1999). Indeed, in the same opinion, the Eleventh Circuit approved the Seventh Circuit's observation that "'[i]t would be a considerable paradox if the worse the securities fraud, the less applicable the securities laws.'" *Id.* (quoting *Lauer*, 52 F.3d at 670). For this reason, several courts have concluded that the federal securities laws apply to non-existent "prime bank" schemes. *See, e.g., Lauer,* 52 F.3d at 670-71*; Sec. Exch. Comm'n v. Bremont,* 954 F. Supp. 726, 730-31 (S.D.N.Y. 1997); *Sec. Exch. Comm'n v. Gallard,* No. 95cv3099, 1997 WL 767570, at *5 (S.D.N.Y. Dec. 10, 1997).

### 4.  *Mr. Vaughn Acted Recklessly*

Because "prime bank" instruments do not exist, courts repeatedly have held that the promoters of such schemes acted recklessly. *See, e.g., Infinity Group*, 212 F.3d at 194 (final judgment); *Deyon,* 977 F. Supp. at 516 (final judgment); *Bremont,* 954 F. Supp at 730 (interim asset freeze); *Gallard*, 1997 WL 767570, at *4 (summary judgment). The reason is apparent. What "prime banks" claim to offer – a combination of huge returns and no risk – is "inconceivable on its face" and imposes a heightened duty to investigate. *Deyon,* 977 F. Supp. at 517; *Sec. Exch. Comm'n v. Milan Capital*, No. 00cv108, 2000 WL 1682761, at *5 (S.D.N.Y. Nov. 9, 2000). Hence, in *Gallard*, *Deyon* and *Infinity Group*, notwithstanding the promoters' protestations that they genuinely believed in such programs, the courts concluded that, because the promoters failed to conduct adequate investigations, they acted with the requisite scienter. In *Gallard,* for example, the defendant recruited investors for such a program even though he did not try to verify the existence of the prime bank instruments and was aware of no one who had successfully invested in such a program. 1997 WL 767570,

at *4.  In *Deyon,* the defendant failed to perform a background check and proceeded with the program even though his request for a bank statement was ignored.  977 F. Supp. at 517-518. In *Infinity Group,* the defendants failed to obtain certified financial statements, to ask about guarantees or insurance, or to obtain a legal opinion or certificates of good standing.  212 F.3d at 194-95.

Here, there is no evidence to indicate that Mr. Vaughn genuinely believed that ARM's investment programs were real.  Even if there were such evidence, Mr. Vaughn's conduct in raising investor funds for the program similarly was reckless.  Moreover, although it is not necessary to the analysis above, nor to the court's conclusion, Mr. Vaughn's assertion of his Fifth Amendment rights against self-incrimination throughout this proceeding reinforces that conclusion.  A court in a civil action may draw an adverse inference against a party that asserts its Fifth Amendment right against self-incrimination.  *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *LiButti v. United States,* 107 F.3d 110, 121-24 (2d Cir. 1997).  Such inferences are not uncommon in SEC enforcement actions.  *See, e.g., Sec. Exch. Comm'n v. Zimmerman*, 854 F. Supp. 896, 899 (N.D. Ga. 1993); *Pagel, Inc. v. Sec. Exch. Comm'n,* 803 F.2d 942, 947 (8th Cir. 1986); *Milan Capital Group, Inc.,* 2000 WL 1682761, at *7.  Because Mr. Vaughn asserted his Fifth Amendment right against self-incrimination throughout this proceeding (at deposition, in response to interrogatories, and in response to requests for the production of documents), the court draws an adverse inference against him.  (*See* Doc. # 114 (Tabs 1, 6, 10).)

### B.  Mr. Vaughn and ARM Offered and Sold Unregistered Securities

Sections 5(a) and 5(c) of the Securities Act prohibit the offer or sale of unregistered securities in the absence of an applicable exemption from registration.  15 U.S.C. § 77e(a), (c). Here, as set forth above, the investments in ARM's purported trading program were "securities" for purposes of the federal securities laws.  ARM sold the securities, since the company dealt directly with the investors, conceived of or planned the scheme by which the securities were sold, and was a substantial factor in the sale of the securities.  *See Sec. Exch. Comm'n v. Friendly Power*, 49 F. Supp. 2d 1363, 1371 (S.D. Fla. 1999); *see also Sec. & Exch. Comm'n v. Southwest Coal & Energy Co.*, 624 F.2d 1312, 1315 (5th Cir. 1980).  Mr. Vaughn sold the securities because he (with others) was responsible for the operation of ARM.  ARM and the individual defendants did not register the interests in the trading program with the Commission.  Accordingly, Mr. Vaughn and ARM violated Sections 5(a) and 5(c) of the Securities Act.

### C.  Relief

#### *1.  Permanent Injunction against Mr. Vaughn*

Having found that the SEC is entitled to summary judgment against Mr. Vaughn on liability, the court turns to the issue of relief.  The SEC asks for a permanent injunction against further violations of the federal securities laws pursuant to Section 20(b) of the Securities Act and Section 21(d)(1) of the Exchange Act.  15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d)(1).  Such a remedy is appropriate if the defendant's conduct indicates that there is a reasonable likelihood of further violations.  *Sec. Exch. Comm'n v. Savoy Indus.,* 587 F.2d 1149, 1168 (D.C. Cir.

1978); *Sec. Exch. Comm'n v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972). When assessing the likelihood of recurrence, courts have considered, among other things, the nature of the defendant's conduct, the degree of *scienter*, and whether the violation is an isolated or repeated occurrence. *Sec. Exch. Comm'n v. Universal Major Indus.*, 546 F.2d 1044, 1048 (2d Cir. 1976); *Sec. Exch. Comm'n v. Ingoldsby,* No. 88-1001, 1990 WL 120731, at *2 (D. Mass. May 15, 1990).

Here, the need for injunctive relief against Mr. Vaughn is compelling. Over the course of more than two years, Defendants defrauded hundreds of investors of at least $1.2 million for an imaginary trading program, promising enormous, and ultimately unattainable, returns on investments. Accordingly, the court will enjoin Mr. Vaughn from further violations of the federal securities laws.

## 2. Disgorgement

Disgorgement is an equitable remedy "designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws." *Sec. Exch. Comm'n v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989). It has long been recognized that the "deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits." *Manor Nursing,* 458 F.2d at 1104. The amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation." *First City Fin. Corp.,* 890 F.2d at 1231-32.

Here, the court finds that the basis for an order of disgorgement is apparent, since Mr. Vaughn defrauded hundreds of investors. The SEC seeks a disgorgement order against Mr.

Vaughn in the amount of $1.2 million.  (Doc. # 241 at 3.)  The court finds that the undisputed

evidence supports and justifies the SEC's request.  Namely, the SEC has submitted a

declaration from Keith Prive and supporting documents, which establish that at least $1.2

million in profits was "causally connected to the violation." *Id.*  Accordingly, the court will

order that Mr. Vaughn pay $1.2 million in disgorgement, plus prejudgment interest calculated

in accordance with the rate used by the Internal Revenue Service for tax underpayments

compounded quarterly.  17 C.F.R.  § 201.600(a).  Liability is joint and several in this case, in

which Defendants had a close relationship, *see supra* footnote 2; among other things, Mr.

Vaughn caused Armtrust to be founded and was "the boss" according to one knowledgeable

witness.  (Doc. # 232 (Suppl. Ex. 5 at 69-70, 188-90)); *see, e.g., Sec. Exch. Comm'n v. Calvo,*

378 F.3d 1211, 1215-16 (11th Cir. 2004).

## C.  Civil Monetary Penalty

Section 20(d)(2) of the Securities Act and Section 21(d)(3) of the Exchange Act

authorize a civil monetary penalty for certain violations of the federal securities laws.  15

U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3).  By enacting these penalty provisions, "Congress

sought to achieve the dual goals of punishment of the individual violator and deterrence of

future violations." *Sec. Exch. Comm'n v. Moran,* 944 F. Supp. 286, 296 (S.D.N.Y.

1996).  For violations involving fraud, deceit or manipulation and that directly or indirectly result

in or create the risk of substantial losses to others, it is permissible to impose a third-tier penalty

in an amount up to the greater of $120,000 or the defendant's gross pecuniary gain as a result

of each violation. 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3); 17 C.F.R. §§ 201.1001, 1002. The exact amount of the penalty is for the court's discretion.

In this case, as described above in the disgorgement discussion, the ill-gotten gains from the Armtrust scam totaled at least $1.2 million. Mr. Vaughn was a principal of Armtrust. In its summary judgment motion, the Commission asks for a "substantial penalty" against Mr. Vaughn in light of what it calls his "flagrant misconduct." (Doc. # 232 at 21.) In a more recent filing, the Commission asks for a civil penalty of $1.2 million against Mr. Vaughn, citing the egregiousness of the violations, the harm to innocent third parties, and the degree of *scienter*. (Doc. # 241 at 3-4.) Having considered the SEC's argument in light of the facts, the court finds that the requested penalty is warranted. Accordingly, the court will order that Mr. Vaughn pay a civil penalty of $ 1.2 million. *See* 15 U.S.C. § 77t(d)(2)(C), 15 U.S.C. § 78u(d)(3)(B)(iii).

## V. CONCLUSION

For the foregoing reasons, it is ORDERED that Plaintiff Securities and Exchange Commission's Motion for Summary Judgment (Doc. # 231) is GRANTED. An appropriate judgment will be entered.

DONE this 3rd day of November, 2008.

                    /s/  W.  Keith Watkins
                    UNITED STATES DISTRICT JUDGE

22